**Derald E. SHUCK, Plaintiff in Error,**

v.

**Bronnie COOK and Kenneth Cook, Defendants in Error.**

**No. 43811.**

Supreme Court of Oklahoma.

Feb. 22, 1972.

D. C. Thomas, Oklahoma City, Richard E. Romang, Enid, for plaintiff in error.

Cook & O'Toole, Oklahoma City, Tom J. Ruble, Taloga, for defendants in error.

DAVISON, Vice Chief Justice.

This action for damages resulted from an accident that occurred on U. S. Highway 183 about 1.2 miles south of its intersection with U. S. Highway 60, when plaintiff in error (plaintiff in the trial court) at approximately 8:00 p. m. on September 8, 1966, driving his Oldsmobile, collided with a Black Angus bull, owned by Bronnie Cook, defendant in error (defendant in the trial court). Kenneth Cook, a

**308**

son of Bronnie Cook, the alleged joint owner of the bull, is a co-defendant in error (a co-defendant in the trial court). Reference to the parties will be made by their trial court designations.

As originally filed plaintiff's petition alleged the occurrence of the accident hereinabove described and that defendants were the owners and keepers of the bull at the time of its escape from a pasture, abutting the west side of the highway, where the collision occurred; that defendants kept a herd of cattle and a Black Angus bull in this pasture; that the collision occurred at the bottom of a draw in plaintiff's line of traffic, at a time the bull was not visible, just as plaintiff started up the incline traveling north; that the impact caused extensive damage to plaintiff's automobile and severe and painful injuries to plaintiff that are permanently disabling.

The petition as originally filed further alleged that the bull had broken out of the pasture a number of times, which was known to defendants or should have been known to them, but defendants failed to take the steps necessary to control the bull and keep him off the highway where he was a hazard to all motorists; that defendants' failure was a violation of 4 O.S.1961, § 98 (Supp.1965) which reads:

"All domestic animals shall be restrained by the owner thereof at all times and seasons of the year from running at large in the State of Oklahoma. Damages sustained by reason of such domestic animals trespassing upon lands of another shall be recovered in a manner provided by law. For the purpose of this act, domestic animals shall include cattle, horses, swine, sheep, goats, and all other animals not considered wild but shall not include domestic house pets."

The petition also alleged unlawful conduct and negligence in defendants' failure to keep the bull off the public highway. Due to resulting deep lacerations to several parts of plaintiff's body, torn muscles, bruises, joint stiffness, brain concussion resulting in permanent brain damage, mental confusion and severe headaches, plaintiff prays for damages in the sum of $100,000.00.

For plaintiff's second, third, fourth and fifth causes of action he adopts allegations in his first cause of action and prays respectively for $25,200.00 damages for past, present and future pain and suffering; $83,600.00 damages for loss of wages and impairment of future earnings; $2,180.90 damages to his automobile and $889.93 for reasonable and necessary medical expense.

Defendants allege in their answer a general denial, contributory negligence and unavoidable accident. Plaintiff's reply was a general denial.

Before dealing with the issues related to negligence, we consider first the action of the trial court in sustaining the oral motion of defendants, made after the selection of the jury, to strike that part of plaintiff's first cause of action based upon 4 O.S. 1961, § 98 (Supp.1965) quoted above and to strike the words "unlawfully," used twice in plaintiff's first cause of action, as descriptive of the conduct of defendants prohibited under § 98. This action of the trial court is assigned as error. Section 98 was enacted in 1965 as § 1, c. 117, Session Laws of 1965. Section 2 of c. 117 repealed what was a substantial part of the Oklahoma "Herd Law" including 4 O.S.1961, §§ 91 through 97, 101 through 112, 114.1, 114.2, 115.1 through 115.4, 121, 122, 131, 137, 138 and 181 through 184 and all other acts or parts of acts in conflict therewith.

We agree with the trial court that § 1, c. 117, Session Laws of 1965 (4 O.S. 1961, § 98) [Supp.1965] was not legislatively intended to protect persons traveling upon the public highways, including traveling motorists against the hazards created by domestic animals escaping the highways. Champlin Refining Co. v. Cooper, 184 Okl. 153, 86 P.2d 61 (1938) is an integral part of this legislative history. In Champlin, defendant's horse had wandered from defendant's premises upon U. S. Highway 75. Upon rounding a curve in the highway about 8:00 p. m., the driver of

plaintiff's car suddenly came upon and ran into defendant's horse resulting in damage to plaintiff's car. Plaintiff sued defendant for damages, involving § 9006, O.S.1931, which before its repeal by Chapter 117, Session Laws of 1965, was 4 O.S.1961, § 131. This section provided in part: "The owner of any stock or domestic animal prohibited by law, from running at large or prohibited by police regulation adopted by vote of any stock district from running at large within the district at any times shall be liable for all damages done thereby while wrongfully remaining at large upon the public highway or upon the lands of another." A further provision granted the injured party a right to "distrain the trespassing animal." In reversing a judgment based upon a jury verdict for plaintiff we held: "Considering the foregoing statute in the light of the above rule as well as the date of enacting the same, it is obvious the statute was enacted for the purpose of protecting agricultural crops from the ravages of straying domestic animals rather than motorists upon the highways." In Merkle v. Yarbrough, Okl., 378 P.2d 333 (1963) we held the Champlin holding should not be limited to agricultural lands but should be extended to cover grazing lands. To this extent only, the holding in Champlin was "disavowed."

With this history of judicial interpretation before it, knowing that it was repealing substantial parts of Oklahoma Herd Law referring to the public highways, and exercising this legislative function at a time of spirited and ofttimes reckless travel upon public highways, the Oklahoma Legislature in 1965 enacted Section 1, Chapter 117, with no specific reference to public highways or the risks of motorist while traveling thereon and with specific reference only to "damages sustained by reason of such domestic animals trespassing upon lands of another."

Paraphrasing language from Champlin, supra, we hold "motorists traveling upon the highways are [not] members of the class which this statute was intended to protect and the injury suffered herein the kind of injury the statute was intended to prevent." 86 P.2d 61, 63(1). The title to Chapter 117, Session Laws of 1965, does not indicate a different intention.

Related to the legislatively intended purpose of § 1, c. 117, Session Laws of 1965, is plaintiff's assigned error that the trial court refused to give plaintiff's requested instructions Nos. 1, 2 and 3. These instructions are bottomed clearly upon the assumption that § 1, c. 117, Session Laws of 1965, was enacted for the protection of motorists traveling upon public highways within the State of Oklahoma, as well as for the protection of agricultural and grazing land owners. Obviously, under our holding delineated above the trial court did not err in refusing such instructions.

■ The plaintiff also assigns as error the giving of the trial court's instructions Nos. 13 and 15, as being outside the scope of the issues in this case and misleading to a lay jury. Instruction No. 13 is: "You are further instructed that the defendants are not an insurer of the safety of persons traveling up and down the Highway in question." The question we must answer here is: Was this instruction confined to the issues and supported by the evidence? Overstreet v. Bush, 208 Okl. 365, 256 P.2d 416. The issues tendered by the pleadings were (1) the charge against the defendants that they were guilty of common law negligence, as distinguished from statutorily prohibited conduct, in failing to prevent their bull from straying upon the public highway; (2) defendants' negligence was the proximate cause of plaintiff's injuries and resulting damages; (3) the defendants' denials of their negligence, proximate cause, injuries and resulting damages; (4) the defendants' charge that plaintiff's contributory negligence was the proximate cause of plaintiff's injuries and resulting damages. A summary of the evidence supporting these issues follow: Limited to physical causation, it may be said the collision of plaintiff's automobile with defendant Bronnie Cook's bull occurred as set

forth above in plaintiff's petition. The night of September 8, 1966, was dark. Plaintiff was traveling at a rate of 55 miles per hour, with his automobile head lights on. As a result of the impact plaintiff's automobile was hurled into the bar ditch. The bull was killed. The plaintiff's resulting lacerations and other injuries were numerous. On the day of the accident and for some time prior thereto, the bull had been kept in a pasture owned by Grace England.

Plaintiff's father, Milo Shuck, testified that, at Dr. Robert A. Bush's clinic where the plaintiff was being treated after the accident, defendant Bronnie Cook said: "that damn black bull, Kenneth [his son and co-defendant] told me had put him in five times today." Defendant Bronnie Cook denied having said this. Kenneth Cook testified that on the day of plaintiff's accident he was working on his farm all morning; that in the afternoon he had gone to a funeral at Oakwood, had not been in the vicinity of the Grace England pasture all day, had not seen his father, until after the accident at the Bush clinic, but he had learned from his mother about 4:30 p. m. on the day of the accident that the bull had gotten out of the England pasture. Kenneth Cook, further testified that he ran the fence line about 5:00 p. m. on September 8, 1966, on the England pasture abutting the highway after talking to his mother, found no wires down, and nothing wrong with the fence which was in average condition; that the bull had been in the England pasture about four months and he had never known the bull to have been out of the pasture before the day of the accident.

Defendant Bronnie Cook testified further that Grace England owned the cattle grazing in the pasture but he had permitted her and his son to use the bull; that she had hired Mr. Heibel to fix her pasture fences and that he, Bronnie Cook, was near her pasture frequently because he farmed her tillable land and he would fix her fence or have it done when necessary.

If the expense was small he would not send her a bill but if the expense was substantial he would bill her and she would pay.

Three witnesses for plaintiff, Alkire, Dierks and Clinesmith, each testified that prior to the day of the plaintiff's accident he saw defendants' Black Angus bull outside the Grace England pasture on Highway 183, sometimes off the highway, on several days and on several occasions saw the defendants in the Grace England pasture but he never notified defendants that he had observed the bull out of the pasture. Dierks testified that the Grace England pasture fence was like the general run of fences in that community, a woven wire fence, about equal to the other fences.

Mrs. Peggy Fuqua, a witness for plaintiff, testified on the day before the accident a lady drove by to tell her that a bull was out on the highway and after ascertaining the bull did not belong to her, called Mrs. Bronnie Cook to tell her Bronnie Cook's bull was on the highway; that she and Mrs. Cook went up to the highway to put the bull in the pasture but found he had returned to the pasture; that the next day about noon, the day of the accident, she received a telephone call informing her the bull was out again; that she then called Mrs. Cook and they drove him into the pasture but did not know where or how he got back into the pasture; that later in the day she was informed the bull was out again but upon their return to the pasture the bull had returned to the pasture.

Applied to the evidence we have just reviewed, the trial court gave a sequence of instructions commencing with the duty of defendants to exercise ordinary care to restrain their cattle from running at large and to keep them in properly maintained enclosures. This was followed by instructions charging defendants with knowledge of the propensities of their livestock and the results of failing to maintain them in adequate enclosures and their duty to know their enclosures were adequate. The instruction here challenged appears in

this group. We believe and so hold it was not outside the issues and not misleading to the jury. The jury's verdict for defendants could have been based either upon its conviction that defendants were not negligent or that under conditions existing at the time of the accident the plaintiff was contributorily negligent for having driven in the night time at the maximum permissible speed. The California cases cited by plaintiff in support of his challenge to this instruction are cases construing statutes enacted clearly, in part, for the protection of motorists traveling upon the public highways.

The challenged instruction No. 15 is a clear statement of the law that the plaintiff who alleges defendants' negligence as the basis of his action has the burden of proving negligence.

The Kansas statutes, G.S.1949-47-122, 47-123, are almost identical with our statute, 1965, supra, pertaining to cattle and other domestic animals running at large.

The term "running at large" has been construed by the Supreme Court of Kansas in the case of Clark v. Carson, 188 Kan. 261, 362 P.2d 71, as follows:

"[The] term 'running at large' within statute prohibiting cattle from running at large does not include situations where animals escape from the owner after due precaution to secure them has been taken and without fault or negligence on his part."

The above opinion further states that

"whether the defendant was negligent, or whether the plaintiff was driving at a speed greater than was reasonable and prudent under the circumstances, or whether he failed to exercise ordinary care for his own safety, were all questions of fact upon which the minds of reasonable men might differ."

Such questions are for the determination of the jury.

In the case of Wilson v. Rule, 169 Kan. 296, 219 P.2d 690, it was held that in an action by motorist to recover damage to automobile as a result of striking mule which was loose on highway, doctrine of res ipsa loquitur did not apply, and that in order for motorist to recover from owner of mule for damages, motorist was required to prove that mule was loose on the highway as a result of its being intentionally turned loose or on account of the negligent failure of the owner or person responsible for its custody to keep it confined.

Neither do we conclude that it was reversible error to refuse plaintiff's counsel the privilege of using charts in his closing argument to the jury. Each chart was 3 feet, 6 inches by 2 feet, 4 inches. One chart, written in red, was headed "Injuries of Derald Shuck" and listed 14 injuries presumed to have occurred as a result of the accident. The other chart written in black was headed Damages and contained 5 items totaling $209,689.83.

It appears that plaintiff's counsel's single request embraced both charts. One chart contained exactly the amount of damages alleged in the ad damnum clause of the petition except the alleged damage to plaintiff's automobile. As stated in a case involving a similar request by counsel in which under carefully worded instructions such permission was granted: "We believe it was proper for the plaintiff's counsel to state and argue the amount of future pain and suffering which he believed the evidence would fairly and reasonably sustain. This amount cannot be referred to as the amount in the ad damnum clause. The ad damnum clause has no probative value and is no part of the evidence. It is common knowledge that the ad damnum clause is the equivalent of the asking price and is inserted in the complaint before any evidence is in the record." Affett v. Milwaukee & Sub. Transp. Corp., 11 Wis.2d 604, 106 N.W.2d 274, 86 A.L.R.2d 227. The cases in which the refusal of the use of blackboards or chart has been upheld are grounded upon the rule that permission or

refusal is within the sound discretion of the trial court. Andrews v. Cardosa, Fla. App., 97 So.2d 43; Henne v. Balick, Del., 1 Storey 369, 146 A.2d 394; Warren Petroleum Corp. v. Pyeatt, Tex.Civ.App., 275 S.W.2d 216, writ of error refused; Mirabile v. New York Central Railway Company, C.A.2d, 230 F.2d 498.

The Oklahoma cases cited by plaintiff's counsel merely hold that permission to plaintiff to use a blackboard is harmless error in the absence of a showing the verdict was excessive. Missouri-Kansas-Texas Railroad Company v. Jones, Okl., 354 P.2d 415 (1960); Kansas City Southern Railway Co. v. Black, Okl., 395 P.2d 416 (1964).

In view of the certain need of careful instructions to the jury when permission to use blackboards or charts in argument to the jury is granted and the risk when permission is given that counsel, however unwittingly, may use the chart or blackboard to put evidence to the jury that was never introduced or to give undue emphasis to certain testimony, we adhere to the rule that to grant or refuse the request is within the sound discretion of the trial court who is in the best position to know how error may creep in. In the trial court's denial of permission in this case to use the charts in the closing arguments to the jury by plaintiff's counsel, we find, under this record, no abuse of discretion.

Moreover, if error be assumed, it was harmless in this case because the jury did not reach the matters delineated in the charts. In a case under the Federal Employers Liability Act the trial judge feared from a colloquy with counsel, that counsel by the use of a blackboard, would bring in matters not in evidence. After holding the trial court's refusal of the use of a blackboard was not error, the appellate court stated in language applicable to this case: "Moreover, there was no prejudice, since counsel intended to use it in adding up items of damages; and the jury never

came to that question." Mirabile v. New York Central, supra.

Affirmed.

BERRY, C. J., and WILLIAMS, JACKSON, IRWIN, HODGES, LAVENDER and BARNES, JJ., concur.