David FIELDS, Appellee,

v.

**VOLKSWAGEN OF AMERICA, INC., a corporation and Volkswagen South Central Distributors, Inc., a Texas Corporation, Appellants.**

No. 46805.

Supreme Court of Oklahoma.

July 27, 1976.

Rehearing Denied Oct. 19, 1976.

50

John W. Norman, Lampkin, Wolfe, Burger, Abel, McCaffrey & Norman, Oklahoma City, for appellee.

John W. Herrick, Ft. Worth, Tex., Elliott C. Fenton and Larry D. Ottaway, Fenton, Fenton, Smith, Reneau & Moon, Oklahoma City, for appellants.

HODGES, Vice Chief Justice.

This is an action for damages for personal injuries sustained by appellee, David Fields (Fields), when his 1971 Volkswagen overturned while he was attempting to negotiate a left hand curve. Fields contends the steering wheel locked while he was driving and he was unable to keep the car on the road. The automobile was equipped with an ignition lock system that prevented the steering wheel from being turned while the ignition was off. It is alleged this system was faulty due to a defect in the locking mechanism which was present when the car left the factory and that the failure of this system was the actual and proximate cause of the accident.

Appellants, Volkswagen of America, the importer of the car, and Volkswagen South Central Distributor, Inc., who sold the car to the Texas Dealer where Fields purchased it, denied the jurisdiction of the court and that there was defect as alleged, raising the defense that the sole and proximate cause of the accident was Fields' own negligence and misuse of the automobile.

The court, with the concurrence of the parties, ordered a bifurcated trial. The case was first tried to a jury on the issue of liability prior to any consideration by the jury of the issue of damages, and the jury returned a verdict for Fields. In the subsequent damage trial, the jury returned a verdict for $150,000.00.

The court denied appellants' motions for a judgment notwithstanding the verdict or a new trial. Appellants appeal, raising several propositions of error which are questions of first impression in this jurisdiction.

The appellants first assert the trial court lacked jurisdiction because neither of the appellants is licensed to do business in Oklahoma and the cause of action did not arise from their doing business in Oklahoma.

The applicable Oklahoma statute upon which in personam jurisdiction of non-resident defendants is based is 12 O. S.1971, § 1701.03(a)(4).[1] Jurisdiction under the long-arm statute is predicated on foreign state activity which results in forum state harm.[2] The intention in Oklahoma is to extend the jurisdiction of Oklahoma courts over nonresidents to the outer limits permitted by the due process requirements of the United States Constitution.[3] The Oklahoma statute gives the courts of Oklahoma personal jurisdiction over any non-domiciliary who can be reached constitutionally as having had sufficient state contacts measured by the jurisdictional yardstick established by the United States Supreme Court in *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945).[4] *Marathon Battery v. Kilpatrick*, 418 P.2d 900 (Okl.1965), accorded this decision and

1. Bases of jurisdiction are determined under the long-arm statute, 12 O.S.1971, § 1701.03 (a)(4):

Bases of jurisdiction. (a) A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action or claim for relief arising from the person's:
(1) . . .
(2) . . .
(3) . . .
(4) causing tortious injury in this state by an act or omission outside this state if he regularly does or solicits business or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this state.

2. *Walker v. University Books, Inc.*, 382 F. Supp. 126, 130 (N.D.Cal.1974).

3. *Burchett v. Bardahl Oil Co.*, 470 F.2d 793, 797 (10th Cir. 1973) ; *Parks v. Slaughter*, 270 F.Supp. 524, 525 (W.D.Okl.1967) ; *Fidelity Bank, N.A. v. Standard Industries, Inc.*, 515 P.2d 219, 222 (Okl.1973) ; *Vemco Plating, Inc. v. Denver Fire Clay Co.*, 496 P.2d 117, 119 (Okl.1972) ; *Hines v. Clendenning*, 465 P.2d 460, 462 (Okl.1970).

4. The Court in *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) said:

" . . . Due process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice' . . . "

determined the test of jurisdiction of the courts of the State of Oklahoma over a non-domesticated, foreign corporation is not solely or necessarily premised on whether the acts of the corporation amount to doing business within this state, but whether the non-resident had significant contacts with the State.[5] This concept was expanded under *B. K. Sweeney Co. v. Colorado Interstate Gas Co.,* 429 P.2d 759, 763 (Okl.1967), where the court held the State of Oklahoma may obtain personal jurisdiction over non-resident defendants in suits resulting from voluntary acts or transactions which have either directly or indirectly created minimum contacts with the forum state, however limited or transient such contacts may be since the state has a manifest interest in providing effective means of redress when harm is caused within its territory.[6] The result of these decisions is that significant contacts which result in a tortious episode in this state render persons answerable in Oklahoma courts in accordance with Oklahoma laws.

The appellee met the burden of proving jurisdiction. It is not necessary to jurisdiction that the car be sold in Oklahoma. At the time of distribution, the appellants could reasonably have anticipated that the car might be used or sold in Oklahoma. Appellants advertise in national magazines, on network television and participate in an advertising fund for the State of Oklahoma which clearly involves engaging in the active solicitation of business in this state and subjects them to the provisions of 12 O.S.1971 § 1701.03(a)(4).

An action in strict liability or manufacturers' products liability is available against both manufacturer and retailer. Processors, assemblers and all other persons who are similarly situated in processing and distribution are included in the definition of manufacturer.[7]

We hold that the court had jurisdiction over both defendants.

The parties agreed the trial should be bifurcated. Bifurcation is a time saving device which allows the issue of liability to be tried initially. The trial proceeds to the second stage concerning damages only if the jury finds in favor of the plaintiff on the issue of liability.

Oklahoma does allow a new trial to be granted on the issue of damages only.[8] This procedure has been followed in subsequent cases where it is clear the error in assessing damages did not affect the entire verdict.[9]

In 1963, Oklahoma adopted two statutes that might be construed to permit this type of trial in multiple claims actions, 12 O.S.

5. In *Marathon Battery Co. v. Kilpatrick*, 418 P.2d 900, 910 (Okl.1965), after noting the consequences imputed to defendant were within its own control and there was no need to act within the state unless it desired to do so the court said:
"The burden laid upon a citizen of this State, when met with jurisdictional objections while seeking to enforce rights arising from the tort of a foreign corporation, is more compelling than the plea that such foreign corporation should not be required to defend its tortious act because not physically present and therefore not amenable to process. Common justice requires such corporation to appear and defend its acts in our courts when those acts are the basis of the action and there is legal justification for the process and no ground exists for any claim the defendant was deprived of notice or right to appear and defend."

6. The test of jurisdiction set by *B. K. Sweeney Co. v. Colorado Interstate Gas Co.*, 429 P.2d 759, 763 (Okl.1967) is:
". . . If a foreign corporation voluntarily elects to act here, whether directly or indirectly, it should be answerable in our courts in accordance with our laws. The consequences we impute to lie within its control. It need not act, or agree to act within this state at all unless it so desires."

7. See *Moss v. Polyco, Inc.*, 522 P.2d 622 (Okl.1974); *Kirkland v. General Motors Corp.*, 521 P.2d 1353 (Okl.1974).

8. *Curtis & Gartside Co. v. Pigg*, 39 Okl. 31, 134 P. 1125 (1913).

9. See *Shinn v. Francis*, 404 P.2d 1017 (Okl. 1965); *Hallford v. Schumacher*, 323 P.2d 989 (Okl.1958).

1971 §§ 323 and 243.[10] None are similar to Federal Rule 42 (b),[11] allowing the trial judge on his own initiative to order separate trials in all cases, and we do not reach the validity of that practice at this time.

■ Although there is a wide diversity among jurisdictions regarding the propriety of separate trials on the issues of liability and damages,[12] there seems to be no reason not to allow separate trials where it would not be prejudicial to either side, and where both sides are in agreement. Separation of the damages issue promises convenience, potential economy, clearer jury understanding of the issues, less embracive closing arguments, and a shorter jury charge at each stage of the trial.[13] Appellants did not challenge and concurred in separation. Where both parties agree to bifurcation, we hold it to be valid.

■ Appellants do not appeal the factum of bifurcation, they do, however, allege a violation of the Okl.Const. art. 2 § 19[14] because, although ten jurors returned a verdict for appellee on the question of liability, they were not the same ten jurors who fixed his recovery at $150,000.00 damages. They claim this is a reversible inconsistency because the Constitution requires three-fourths of the jury concur in

10. 12 O.S.1971 § 323 provides:
All claims which arise out of the transaction or occurrence that is the foundation of the plaintiff's claim and which contain common questions of fact, may be joined in one action, and any person who is liable on such a claim may be joined as a party to the action. The court may order a separate trial of any claim or of any issue in the furtherance of a just and prompt determination of the controversy and to avoid delay or prejudice. Nothing herein permits the joinder of liability insurers or creates any right of contribution or indemnity which has not heretofore existed.
12 O.S.1971 § 243 provides:
The defendant may join as a party to a counterclaim, a set-off or right to relief concerning the subject of the action, any person who may be jointly and severally liable to the defendant on such counterclaim, set-off or other right to relief. The court, in its discretion, may order a separate trial of said counterclaim, set-off or cross-claim or of any issue therein, to avoid delay or prejudice.

11. Rule 42(b) of the Federal Rules of Civil Procedure provides:
The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, cross-claim, counterclaim, or third-party claim, or of any separate issue or of any number of claims, cross-claims, counterclaims, third-party claims, or issues, always preserving inviolate the right of trial by jury as declared by the Seventh Amendment to the Constitution or as given by a statute of the United States.

12. Rule 42(b) and many similar state statutes have been held to permit a separate trial of liability and damage issues. See *LoCicero v. Humble Oil & Refining Co.*, 52 F.R.D. 28 (E.D.La.1971); *Clements v. Modern Maid Packers, Inc.*, 23 F.R.D. 662 (D.Md.1959); *Tilley v. International Harvester Co.*, 208 Kan. 75, 490 P.2d 392 (1971); *Mercado v. City of New York*, 25 A.D.2d 75, 265 N.Y.S. 2d 834 (1966); *Woods v. Harker*, 22 Ariz. App. 83, 523 P.2d 1320 (1974).
Texas, however, holds the opposite view. In *Iley v. Hughes*, 158 Tex. 362, 311 S.W. 2d 648, 85 A.L.R.2d 1 (1958), the court held the rule, similar to Rule 42(b) did not authorize the court to grant separate trials on the issues of damage and liability. See *Eubanks v. Winn*, 420 S.W.2d 698 (Tex.1967) and *State v. Sawyer*, 262 Or. 610, 500 P.2d 1052 (1972). Also see Zeisel and Callahan, "Split Trials and Time Saving: A Statistical Analysis," 76 Harv.L.Rev. 1606 (1963). Annot., "Tort—Separate Trial of Issues," 85 A.L.R.2d 9 for other cases.

13. *LoCicero v. Humble Oil & Refining Co.*, supra, note 12.

14. Okla.Const. art. 2 § 19 provides:
The right of trial by jury shall be and remain inviolate, and a jury for the trial of civil and criminal cases in courts of record, other than county courts, shall consist of twelve men; . . . In civil cases, and in criminal cases less than felonies, three-fourths of the whole number of jurors concurring shall have power to render a verdict. In all other cases the entire number of jurors must concur to render a verdict. In case a verdict is rendered by less than the whole number of jurors, the verdict shall be in writing and signed by each juror concurring therein.

the verdict, and that the requisite number of the same jurors must agree to all essential answers. We do not agree.

Oklahoma has not ruled on the issue of whether the same jurors must sign both verdicts in a bifurcated trial. To our knowledge no other state has ruled on this precise question, nor does there appear to be any federal interpretation of Rule 42 (b) directly applicable. However, the validity of this practice may be inferred from several Federal Rules Decisions. *Romer v. Baldwin*, 36 F.R.D. 259 (E.D.Pa.1963) and *Driver v. Phillips*, 36 F.R.D. 261 (E.D.Pa.1964) both hold that a court is authorized to appoint additional jurors to hear the liability issue so that if a juror who has been part of the panel returning the liability verdict becomes ill or otherwise incapacitated the alternate juror will be available to decide the damages. If this should happen, the second verdict would of necessity, be signed by a different jury.

Although the case of *Ward v. Weekes*, 107 N.J.Super. 351, 258 A.2d 379, 381 (1969) involves liability and damages encompassed in a single verdict and a single trial, and in the instant case there were two trials and two separate and distinct verdicts, we believe the reasoning is applicable to the problem before us. The court held a ten juror verdict was valid even though the same ten of twelve jurors did not agree on the issue of liability and damages.[15] The court said:

> To adopt the reasoning that the one or two jurors voting against liability . . . cannot consistently participate in the solution of the remaining issue of damages is untenable. It presupposes that because such dissenting juror concluded plaintiff was not entitled to recover, he would then prejudice the other jurors in their consideration of the damage issue—it is inferred he would hold

out for a minimum verdict for plaintiff resulting in a compromise, or otherwise improper, verdict. We see no sound reason to assume that such juror would violate his oath of office and not render "a true verdict according to the evidence." It is more proper to assume that when a juror is outvoted on an issue (liability) he will accept the outcome and continue to deliberate with the other jurors honestly and conscientiously to decide the remaining issues . . .

> \* \* \* \* \* \*

> . . . Assuming that two jurors dissent on the liability issue, should the judge instruct the jury that the two dissenters must leave the room so as not to taint the remaining issues to be decided? Or should he instruct them to remain but refrain from participating in any further discussion and disposition of the case? Either alternative would be an unwarranted and unreasonable construction of the previously cited provisions in the Constitution, statute and rules. It would improperly remove two minds from considering all the issues to be resolved in reaching a verdict. . . .

In the instant case ten jurors returned a verdict for the plaintiff on the question of liability. If the two jurors who found defendant not liable could not sign the second verdict on damages, they would be precluded from participating in the decision on damages and thus the jury in the second trial would consist of only ten persons which could be considered as contrary to the Okl.Const. art. 2 § 19.

Our system of justice revolves around our reliance on the wisdom of juries. Surely our confidence in their judgment must include a belief that, although a juror concludes in a first trial that a defendant is not responsible for the plaintiff's injuries, he is still capable of accepting as fact

---

15. Also see *Naumburg v. Wagner*, 81 N.M. 242, 465 P.2d 521 (1970) which holds that as long as none of the jurors are guilty of irreconcilable inconsistencies or material contradictions the verdict would be valid regardless of their conviction as to liability. In this case a juror who found both plaintiff and defendant negligent still voted in favor of the $30,000.00 damages for plaintiff.

in a second trial that the plaintiff was injured, and then determining independently to what extent he was damaged. This is precisely the situation where the court directs a verdict for a plaintiff but leaves the amount of damages to the jury, a common Oklahoma practice.

We hold that the two verdicts were valid.

Appellants claim additional error in two areas of the jury instructions given during the liability trial. They first claim the court erred in refusing to instruct on contributory negligence or abnormal use.

We acknowledge the fact that this case was tried prior to *Kirkland v. General Motors,* supra. The instructions given are an example of the confusion that exists in the field of products liability litigation. In *Kirkland* we stated that its principles will be applied retroactively in cases which have been tried and are for decision on appeal where it would not prejudice the rights of the litigants. This is such a case.

 The petition and evidence offered at trial by appellants present the elements of manufacturers' products liability as enunciated in *Kirkland.*[16] The only defenses to this theory go to causation or to misuse or abnormal use of the product. The defense of contributory negligence is not available. If it was error to give an

instruction on negligence but not on contributory negligence, it was harmless.

The court gave no direct instruction as to misuse or abnormal use.[17] Generally when we speak of the defense of misuse or abnormal use of a product we are referring to cases where the method of using a product is not that which the maker intended or is a use that could not reasonably be anticipated by a manufacturer. A distinction must be made between use for an abnormal purpose and use for a proper purpose but in a careless manner (contributory negligence).[18]

An example of the difference between misuse and contributory negligence may be found in *Ford Motor Company v. Matthews,* 291 So.2d 169 (Miss.1974). There plaintiff claimed that the safety switch mechanism on a tractor that was designed to prevent it from starting while in gear was defective, allowing the tractor to start and run over plaintiff's decedent. The court held, although decedent was contributorily negligent in standing on the ground and starting the tractor while it was in gear, this was not a defense since it was not misuse or abnormal use of the tractor because such negligence could be reasonably foreseeable by the tractor manufacturer.

 In order to determine whether the use of a product by a plaintiff is abnormal, we must ask whether it was reasonably

---

16. The elements of products liability delineated by *Kirkland v. General Motors Corp.,* 521 P.2d 1353, 1363 (Okl.1974) include:

"First of all Plaintiff must prove that the product was the cause of the injury; the mere possibility that it might have caused the injury is not enough.

Secondly, Plaintiff must prove that the defect existed in the product, if the action is against the manufacturer, at the time the product left the manufacturer's possession and control. *Thompson v. Trane Co.,* 500 P.2d 1329 (Okl.1972). If the action is against the retailer or supplier of the article, then the Plaintiff must prove that the article was defective at the time of sale for public use or consumption or at the time it left the retailer's possession and control.

Thirdly, Plaintiff must prove that the defect made the article unreasonably dangerous to him or to his property as the term "unreasonably dangerous" is above defined."

17. The instruction stated:

"The defendants deny that there was any defect in the steering mechanism and contend that the accident was caused solely by the negligence of the plaintiff in one or more of the following ways:

1. Driving at an excessive speed;
2. Failing to control his vehicle properly;
3. Driving while his ability and reactions had been affected by the consumption of beer."

18. Noel, "Defective Products: Abnormal Use, Contributory Negligence and Assumption of Risk," 25 Van.L.Rev. 93 (1972).

foreseeable by the manufacturer.[19] A manufacturer is not liable for injuries resulting from such use if it is not foreseeable.[20]

It is certainly foreseeable by a car manufacturer a person might drive a car over the speed limit or after drinking; but unless this excessive speed or drinking caused the accident, these factors do not bar recovery by the plaintiff even though they may have "contributed" to the accident.

In this case appellants claim that appellee's excessive speed and driving while impaired caused the accident. The instructions included these theories.

If Fields had been drinking or driving too fast, this would not constitute a "misuse" but may be more accurately characterized as "use for a proper purpose, but in a careless manner," i. e., contributory negligence, and thus would not be a defense in this case, unless these factors caused the accident, or recovery is sought in pure negligence.

By this we do not mean to say that drunkenness could never be misuse of a product, but the situation does not arise in the peculiar facts and circumstances of this case. The instructions, although lacking in many respects in this area, were more nearly proper than those offered by the appellants and refused by the court.

 It is also asserted by appellants that the instructions carried an erroneous definition of proximate cause. The court defined it as . . . "that cause which, in natural and probably sequence, brought about the injury alleged. It need not be the only cause, nor the last or nearest cause. It is sufficient if it concurs with some other cause acting at the same time, which in combination with it, brings about the injury." Appellants claim this type of instruction would allow a jury to return a

verdict for the plaintiff even though plaintiff contributed to the cause of the accident. This objection is again based on the theory of contributory negligence and is not a valid objection for reasons heretofore stated. A judgment will not be disturbed because of allegedly erroneous instructions, unless it appears reasonably certain that the jury was misled thereby.[21] Instructions are sufficient when, considered as a whole, they present the law applicable to the issues.[22] We specifically hold that under the circumstance of this case, the instructions were adequate and did not constitute reversible error.

 Another question of first impression to this court involves the admission into evidence of a recall letter issued by appellants relating to the 1971 Volkswagen, the make and model of the accident vehicle. The letter stated that a "guide pin" in the steering column may have been damaged during assembly and as a result difficulties might develop in unlocking the steering on the car. This letter had not been received by Fields prior to the accident, thus no question exists as to his voluntary assumption of a known risk. Appellants attempted, by a motion in limine, to prevent the introduction of the letter into evidence. The motion was overruled, the letter was admitted, and appellants claim error. Title 15 U.S.C. § 1402 which is a section of The 1966 Traffic and Motor Vehicle Safety Act, requires every manufacturer of a motor vehicle to furnish notice to the purchaser of any defect in the vehicle which might relate to motor vehicle safety. This provision is the basis of the many "recall campaigns" brought about by governmental or quasi governmental agencies. Public policy would seem to prohibit indiscriminate use of the letters for the same reason that evidence of subsequent

19. *Colosimo v. May Department Store Co.*, 325 F.Supp. 609 (W.D.Pa.1971); *Cronin v. J. B. E. Olson Corp.*, 8 Cal.3d 121, 104 Cal. Rptr. 433, 501 P.2d 1153 (1972).

20. 4 E Frumer and Friedman, Products Liability § 404 (1971, Supp.1975).

21. *Missouri-K.T.R.R. v. Harper*, 468 P.2d 1014 (Okl.1970).

22. *Loftis v. LaSalle*, 434 P.2d 221 (Okl. 1967).

repairs is not admissible.[23] A defendant should not be penalized for obeying the law, but where the plaintiff shows independently there is such a defect, the dangers inherent in recall evidence are small and the introduction of a recall letter does not constitute reversible error.[24]

Appellants claim that the recall letter is irrelevant. They claim it is the "longitudinal pin," not the "guide pin," that must malfunction before the steering will lock. Appellee agrees that the basic question is one of relevancy and that the usual rules of evidence should apply. If the defect mentioned in the recall letter is not the defect claimed to have caused the accident then the letter is irrelevant and inadmissible.[25] The plaintiff is required to present testimony that the described defect actually existed. Where plaintiff's theory does not depend upon the defect described in the letter the recall evidence is clearly irrelevant. Evidence of recall, standing alone, is not sufficient to sustain a verdict against the defendant.[26]

In *Nevels v. Ford Motor Co.,* 439 F.2d 251, 258 (5th Cir. 1971), the court upheld a judgment against the Ford Motor Company for damages acquired when a steering mechanism failed. In holding the admission of a recall letter to be proper, the court said:

> "The evidence [recall campaign] was relevant not only with respect to the statutory duty of Ford, but also in regard to plaintiff's contention of negligent assembly in the manufacturing process."

In this case, the testimony of expert witnesses was contradictory. Appellee did offer his experts' testimony prior to the introduction of the recall letter. Both of his witnesses testified that several times while testing the locking mechanism from appel-

lee's car, the steering would lock while the engine was on. Evidence was presented that the guide pin in the plaintiff's ignition lock was defective. These witnesses testified that in examining the lock, it appeared that the guide pin had been out of line and rubbing against the side of the lock. It was shown that this could have caused the longitudinal pin to malfunction allowing the cam or bolt to drop down, thus locking the steering.

The recall letter by itself does not make a prima facie case or shift the burden of proof. It does not prove that the defect existed at the time of the accident. This must be proved independently. But if a defect contributing to or causing the accident is the defect that is the subject of the recall letter, then the letter would be some evidence that the "defect existed at the time the product left the manufacturer." This is an element that the plaintiff is required to prove. See *Kirkland v. General Motors,* note 15, supra.

The appellee met his burden of proving the relevance of the recall letter by testimony, although controverted, which would indicate:

1. guide pin in appellee's ignition lock was defective, and

2. a defective guide pin could have caused steering wheel to lock while the motor was running.

The recall letter was properly admitted.

Appellants also claim that the trial court should have granted a new trial on the grounds of two counts of misconduct of the jury. Two affidavits were offered: one, an affidavit of a juror who stated that a deposition, not admitted into evidence, was found in the jury room; and the other, an affidavit of counsel for the defendant that he heard someone say that

---

23. McCormick on Evidence, Ch. 26 § 275 p. 666 (2nd ed. 1970)..

24. *Landry v. Adams,* 282 So.2d 590 (La. App.1973).

25. *Kane v. Ford Motor Co.,* 450 F.2d 315 (3rd Cir. 1971).

26. See 15 U.S.C.A. § 1402 and cases annotated and Morrissey, "Recall Programs," 3 Incl. Brief No. 3 (1974).

a juror had commented to an outsider regarding the trial.

The bailiff inadvertently allowed a copy of the deposition of the appellee, belonging to the appellants, to be taken into the jury room. Appellants interviewed the jurors following both trials and obtained an affidavit signed by one of the jurors stating: "I glanced at this deposition, and handed it to the male juror who sat on my right in the jury box. During the jury's deliberation this male juror looked through this deposition and may have obtained from it the date of David Fields' accident."

Appellants claim since the deposition contained material regarding the extent of appellee's injuries, it was inadmissible in the trial on liability and it thus constituted reversible error for it to be in the hands of the jury.

The general rule is that a juror's affidavit will not be permitted to impeach a verdict for misconduct occurring either inside or outside the jury room.[27] Appellants erroneously claim *Barnhart v. International Harvester,* 441 P.2d 1000, 1006 (Okl.1968) holds this rule does not apply where knowledge of the misconduct comes from some other source than the juror's affidavit. However, the opinion does not create an exception to the general rule but holds where the "knowledge of the misconduct came from a source other than the affidavit of the juror the question of competency of the juror's testimony does not require consideration."

Fields contends since the deposition belonged to appellants' counsel, not appellee, the court did not abuse its discretion in refusing to grant a new trial. He claims contrary to appellants' contention, the deposition was highly prejudicial to him because it contained red pencilled underlinings of portions relating to his arrest record and of a previous accident. The court agreed with appellee and held since the deposition was more harmful to the ap-

pellee than to the appellants there was no reversible error.

The case of *Davenport v. Waite,* 175 Cal.App.2d 623, 346 P.2d 501 (1960) is analogous to the present situation. There, the court struck out the affidavits of two jurors to the effect that the deposition of the defendant, not introduced into evidence, was inadvertently taken into the jury room. The court held that, although the taking of a deposition into the jury room is erroneous, the question of whether it constitutes grounds for a new trial is one addressed to the sound discretion of the court. We find that the inadvertent taking of the deposition to the jury room was harmless error.

Appellants' second affidavit of misconduct relates to the assertion of the appellants that one of the jurors discussed the case with an outsider in violation of the admonition of the court. Appellants support this accusation with an affidavit of one of their attorneys who claimed that he heard a friend say he heard a juror say, "The case looked bad for the plaintiff." This was hearsay, and was properly excluded.

Appellants further allege several incidents of misconduct of appellee's counsel as grounds for reversal. Prior to trial, the court admonished Fields' counsel not to go into his "war record." During the liability trial, while accounting for time spent since graduation from high school, Fields testified he had been in the service. Over the objection of appellants' counsel, the court allowed appellee to testify briefly that he was in the service, but he went no further into his "war record." During the trial on damages, while testifying as to his physical condition, Fields' counsel asked him if he were in Vietnam and what type duty he had there. When the objection of appellants was sustained, counsel changed the line of questioning. He explained to the court that he believed that the admonition against mentioning the war record

27. *Horn v. Sturm,* 408 P.2d 541 (Okl.1965).

was only to apply during the liability trial, and that he was merely attempting to show the type of activities in which appellee had previously been engaged.

Appellants claim this line of questioning is highly prejudicial and is gross misconduct requiring reversal, citing *Seismic Explorations, Inc. v. Dobray*, 169 S.W.2d 739 (Tex.Civ.App.1943). In that case plaintiff showed the jury his honorable discharge and pictures of soldiers serving with him during the war in the Philippines. The court held this was so prejudicial as to require reversal.

 In this case Fields' Vietnam tour of duty was mentioned only briefly and in the trial on damages. No emphasis was placed on his record as it was in *Seismic*, nor did it appear his attorney was attempting to use this fact to prejudice the jury. If interrogation of a witness is alleged to be improper but such interrogation was harmless and had no effect upon the jury's verdict, such interrogation is not grounds for a new trial. [28]

Another area of alleged misconduct involves a line of questioning by appellee's counsel during the first portion of the trial.

At the pre-trial conference, appellants had listed Mr. H. as an expert witness. His deposition had been taken by appellee but no attempt was made to introduce it into evidence, since Mr. H. was in the courtroom. Mr. H. sat through the first part of the trial but was not called by appellants. He then left. Counsel would ask a witness whether he agreed with Mr. H., a representative of Volkswagen, on a point or would comment on something Mr. H. might have said had he been present. During closing arguments, appellee's counsel made a statement that Mr. H. "told what I believe was the truth which you never got to hear." He later commented that appellants were using decoys and not

giving the jury, Mr. H. "the real thing from Germany."

Appellants claim this type of questioning constitutes commenting on material not in evidence. They also claim that counsel's repeated reference to Mr. H.'s being from Germany was an appeal to the ethnic prejudices of the jury.

Counsel for appellant apparently believed that Mr. H. was to testify, citing *Arkansas State Highway Commission v. Phillips*, 252 Ark. 206, 478 S.W.2d 27 (1972), which holds if a witness is available to a party and by reason of employment is subject to party's direction, failure to call him with reference to any fact creates a presumption that had the witness testified, his testimony would have been adverse to that party. [29]

Appellants further allege prejudice in that Fields' counsel accused appellants of altering and spoiling evidence. Appellee's expert witness testified the ignition lock in question lacked grease when it was removed from Fields' car. However, while examining it at the trial, he noted that there was grease present on the guide pin that was not there when the witness dismantled it prior to delivering it to appellants' representatives for their examination. Appellants also claim that counsel's passing reference to injuries of appellee not being proper in the liability trial was prejudicial.

Appellants' strongest argument for reversal in this area is presented by *Magaline v. J. V. Harrison Truck Lines, Inc.*, 446 S.W.2d 920 (Tex.Civ.App.1969). There, testimony of witnesses varied widely. The record showed that the trial judge unsuccessfully attempted to confine the errant counsel to the record, by sustaining opposing counsel's objections and admonishing the jury not to consider certain of counsel's remarks. The Texas court recog-

---

28. *Montgomery v. Murray*, 481 P.2d 755 (Okl.1970).

29. See also *Jacobson-Lampkin Paving Co. v. McMichael*, 277 P.2d 122, 126 (Okl.1954);

*Financial Security Assurance Co. v. Wright*, 254 Ark. 791, 496 S.W.2d 358 (1973); *Phillips Construction Co. v. Williams*, 254 Ark. 824, 496 S.W.2d 417 (1973).

nized the great latitude allowed counsel in discussing evidence and issues but qualified the privilege by saying that he must remain within the record. The court continued by stating although certain points complained of standing alone would not be reversible error, the cumulative effect when considered in the light of the whole record probably did cause the rendition of an improper judgment and was grounds for reversal.

■■■■■ In this case, counsel was properly allowed to comment on and draw inferences from the evidence. The line of questioning by appellee's counsel appears to have been an attempt to make some kind of consistent testimony out of a scramble of contradictory and conflicting evidence as to what caused the steering to lock. When the court sustained an objection of appellants, Fields' counsel changed his line of questioning. Counsel's reference to Mr. H.'s being from Germany could not be considered as prejudicial since it is common knowledge that Volkswagens are made in Germany. The jury was certainly aware that appellee was damaged in some way, so that a slight reference to his injuries would not be prejudicial. Although appellants denied tampering with the lock, the court was correct in permitting counsel to comment on evidence of alteration.

This was a hotly contested case. We can expect that in the heated contest of a lawsuit the zeal of counsel may lead to making of "too violent deductions which are neither fully borne out by the testimony nor wholly necessary to legitimate discussion of the issues." [30] Although not condoning arguments or conduct which may transgress professional ethics in an effort to play upon sympathy of a jury or induce a feeling of prejudice against one party, the court recognized that different counsel utilize varying techniques.

■■■■■ Conduct of counsel ordinarily is not grounds for reversal, unless such conduct substantially influences the verdict or denies the defendant a fair trial. [31] The crucial question is whether counsel's remarks resulted in actual prejudice. This lies within the discretion of the trial court and an appellate court should not set aside a judgment for that reason unless it clearly appears that it influenced the verdict. In determining whether attorney's conduct had that effect we must look to the record and consider all pertinent facts and circumstances shown therein. [32] From our examination of the record we feel that there was ample evidence for the jury to find for appellee had counsel not indulged in the challenged arguments.

Judgment as to the liability of appellants is affirmed.

During the trial on damages, the trial court sustained Fields' objections to the admission of testimony that he was not wearing his seat belt and also refused appellants' requested instruction to the jury that failure to wear a seat belt could be considered in mitigation of damages. Appellants claim error.

■■■■■ This is a question of first impression in this court. There is no common law or statutory duty requiring the use of seat belts. [33] Imposition of new and recent technological advances are not usually inducted into doctrines of law, until such time as they have been sufficiently tried, proven and accepted for the purpose they

---

30. *Hazelrigg Trucking Co. v. Duvall*, 261 P.2d 204 (Okl.1953).

31. *Teel v. Gates*, 482 P.2d 602 (Okl.1971).

32. *St. Louis-S.F. Ry. v. McBride*, 376 P.2d 214 (Okl.1961).

33. 47 O.S.1971 § 12–413 provides:
Seat belts or shoulder harnesses. It shall be unlawful for any person to sell or offer for sale at retail or trade or transfer from or to Oklahoma residents any passenger vehicle which is manufactured or assembled commencing with the 1966 models, unless such vehicle is equipped with safety belts or safety shoulder harness combinations which are installed for the use of persons in the left front and right front seats thereof.
This does not impose any statutory duty to use such.

**62**

were intended. Historically, the seat belt phenomenon is in its infancy. It is in a state of influx.

Although the use of seat belts is frequently extolled as the savior of the horseless carriage, the fact remains, public acceptance of their use is minimal. Right or wrong, to many people the automobile represents freedom of movement. Devices such as seat belts confine and restrict, and they may magnify the motorist's fear of entrapment in a burning or submerged vehicle.

Both industry and government are now aware that while seat belts are beneficial, their use and acceptance cannot be arbitrarily thrust upon the traveling public. Consequentially, on October 28, 1974, the controversial mandatory seat belt interlock system was withdrawn and industry has intensified its research to determine other possible alternatives.

If the appellants in this case are guilty of the acts of negligence as alleged, which caused the accident and resulting injuries, then they should be held accountable as constitutionally and statutorily required. If the allegations of negligence are true, appellee did nothing to cause the accident. Should he be required to anticipate the negligence of the appellants?

We think not. One's duty to mitigate damages cannot arise before he is damaged. The failure to minimize must occur after the injury.[34] At most the failure of the appellee to use the seat belt merely furnished a condition by which the injury was possible. It did not contribute to or cause the accident. It is well established in our court that if the negligence merely furnishes a condition by which the injury was possible, and a subsequent act caused the injury, the existence of such a condition is not the proximate cause of the injury.[35]

Although there is a conflict in other jurisdictions who have been confronted with this issue, the majority of the cases hold that the failure to use seat belts is not a defense to establish contributory negligence or to reduce the amount of damages to the injured party.[36]

In view of the lack of unanimity on a proper seat belt system, the lack of public acceptance, and in the absence of any common law or statutory duty, we find that evidence of the failure to use seat belts is not admissible to establish a defense of contributory negligence or to be considered in mitigation of damages. For the present time we await the direction of the legislature.

Appellants also assert error during the trial on damages because appellee's counsel placed certain figures on the blackboard prior to his argument to the jury. The use of a blackboard during closing argument is a matter within the discretion of the trial court and is not error.[37] The court gave counsel for appellee permission to use the blackboard during closing argument. During recess after both sides had rested, counsel wrote some figures on the blackboard in order to save time. The record shows that the figures added up to $404,454.00. When it was discovered that the blackboard had inadvertently been exposed to the jury, it was immediately turned around and not revealed again until utilized in closing arguments.

34. *Carter Oil Co. v. Jackson*, 194 Okl. 621, 153 P.2d 1013 (1944).

35. *Cheatham v. Van Dalsem*, 350 P.2d 593 (Okl.1960).

36. *Woods v. Smith*, 296 F.Supp. 1128 (N.D. Fla.1969); *Derheim v. N. Fiorito Co.*, 80 Wash.2d 161, 492 P.2d 1030 (1972); *Robinson v. Lewis*, 254 Or. 52, 457 P.2d 483 (1972); *Clark v. State*, 28 Conn.Sup. 398, 264 A.2d 366 (1970); *Miller v. Miller*, 273 N.C. 228, 160 S.E.2d 65 (1968); *Dillon v. Humphreys*, 56 Misc.2d 211, 288 N.Y.S.2d 14 (1968); *Moore v. Fischer*, 31 Colo.App. 425, 505 P.2d 383 (1973); *Placek v. City of Sterling Heights*, 52 Mich.App. 619, 217 N.W.2d 900 (1974); *King Son Wong v. Carnation Co.*, 509 S.W.2d 385 (Tex.Civ. App.1974); *Lipscomb v. Diamiani*, 226 A.2d 914 (Super.Ct.Del.1967).

37. *Shuck v. Cook*, 494 P.2d 306 (Okl.1972); *Kansas City S. Ry. v. Black*, 395 P.2d 416 (Okl.1964).

*McLaney v. Turner,* 267 Ala. 588, 104 So.2d 315 (1958) cited by appellants held that it was error but not prejudicial error to set up a blackboard in the presence of the jury before court convened. In this case, the jury was to see the blackboard during closing arguments. There is no evidence that the premature display had any meaning to, or prejudiced the jury in any way. The award of $150,000.00 actually given is far below the amount written on the blackboard. We find this incident to be harmless error and thus to be disregarded.[38] 12 O.S.1971 § 78.

 Appellee cross appeals the trial court's refusal to add interest in the amount of $20,345.47 to the $150,000.00 judgment pursuant to 12 O.S.1971 § 727 (2) which provides that the trial court shall add interest on a verdict for damages by reason of personal injuries at the rate of 6% per annum from the date the suit commences to the date of the verdict.

This suit was commenced on March 29, 1971. The statute was approved June 16, 1971, and the verdict returned July 6, 1973. In *Benson v. Blair,* 515 P.2d 1363 (Okl. 1973) this court held specifically that this statute, because it is procedural rather than substantive, directs allowance of interest on judgments from the time the suit commenced to the date of the verdict, notwithstanding that the suit was commenced prior to the effective date of the legislation.

The decision of the trial court is reversed in part as to its refusal to allow interest. The case is remanded to the trial court with instructions to add interest on the verdict at the rate of six percent (6%) per annum from the date the suit was commenced to the date of the verdict. The decision of the trial court is otherwise affirmed.

WILLIAMS, C. J., and IRWIN, LAVENDER, BARNES and SIMMS, JJ., concur.

DAVISON, BERRY and DOOLIN, JJ., concur in part and dissent in part.

---

**38.** 12 O.S.1971 § 78 provides:

Immaterial errors to be disregarded. The court, in every stage of action, must disregard any error or defect in the pleadings or proceedings which does not affect the substantial rights of the adverse party; and no judgment shall be reversed or affected by reason of such error or defect.